Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505-4521
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARITZA ALBARAN, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>    v.<br><br>TIK TOK INC. (f/k/a MUSICAL.LY, INC.), and BYTEDANCE INC.,<br><br>      Defendants. | Case No. 2:23-cv-00486<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

<u>TABLE OF CONTENTS</u>

I.    NATURE OF THE ACTION ..................................................................1

II.   THE PARTIES .....................................................................................2

  A.   Plaintiff..........................................................................................2

  B.   Defendants .....................................................................................2

III.  JURISDICTION AND VENUE ...........................................................3

IV.   FACTUAL ALLEGATIONS ................................................................3

  A.   History of the TikTok App .............................................................3

  B.   TikTok's Business Model Monetizes User Data for Profit................6

  C.   Global Privacy Concerns Regarding TikTok's Data Use Practices.....10

    1.   Concerns in the U.S. ..............................................................10

    2.   Concerns Abroad.....................................................................14

    3.   Biometric Data Privacy Litigation ........................................14

  D.   TikTok's Use of In-App Browsers to Intercept Users' Sensitive and Personal
       Information Input into Third-Party Websites .................................15

  E.   The In-App Browser Data Collected by TikTok Is Inherently Valuable to
       Plaintiff, Class Members, and Third-Parties .................................20

  F.   Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in the
       Data Collected by Defendants' In-App Browser ...........................21

  G.   Plaintiff and Class Members Did Not Consent to Defendants' Collection of
       Data Through TikTok's In-App Browser........................................22

V.    TOLLING............................................................................................23

VI.   CLASS ALLEGATIONS ....................................................................24

VII.  CLAIMS FOR RELIEF ......................................................................25

  COUNT ONE *Violation of the Federal Wire Tap Act*..........................25

  COUNT TWO *Violation of the California Invasion of Privacy Act* ...........28

  COUNT THREE *Violation of the Comprehensive Computer Data Access and
  Fraud Act*.............................................................................................30

  COUNT FOUR *Violation of California Business & Professions Code*....................31

  COUNT FIVE *Violation of Common Law Invasion of Privacy*.....................33

  COUNT SIX *Invasion of Privacy and Violation of the California Constitution* ........35

  COUNT SEVEN *Unjust Enrichment* ..................................................37

VIII. PRAYER FOR RELIEF ......................................................................38

IX.   DEMAND FOR JURY TRIAL ...........................................................40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   NATURE OF THE ACTION

1.    Plaintiff brings this putative class action on behalf of all persons who downloaded TikTok, a video-sharing social media app that allows users to create and share short-form videos on any topic (the "TikTok App," "TikTok," or "the App"). At issue here is TikTok's use of in-app website browsers ("in-app browsers"), which allow users to tap an embedded URL within the App. While these browsers are based on external servers, such as Safari, developers such as TikTok can adjust them to run their own JavaScript code, allowing them to track user activity without consent.

2.    Unbeknownst to Plaintiff and Class members, Defendants TikTok Inc. and ByteDance Inc. (collectively, the "Defendants") invaded their privacy by utilizing in-app browsers to intercept valuable information about Plaintiff and Class Members without their consent.

3.    At no time, including prior to downloading and accessing the App, did Defendants disclose to Plaintiff or other Class Members that clicking an embedded link inside the App to access an external website, to make a purchase, or to seek information external to the application itself, would push them into an in-app browser that automatically tracks and records all their data while they seemingly are outside of the TikTok App.

4.    As described in further detail below, the in-app browser inserts JavaScript code into various websites advertised by TikTok and visited by the App's users. The JavaScript code's intended function is to track, collect, and use every detail about TikTok users' website activity.

5.    TikTok's covert utilization of its in-app browser has allowed the social media powerhouse to collect widespread amounts of information about its users—some of which is highly sensitive, personal, and invasive—by tracking their activities on third-party websites. In doing so, Defendants have unlawfully intercepted private and personally identifiable data from unsuspecting TikTok users which is subsequently used to generate massive revenues by selling and providing access to this data.

CLASS ACTION COMPLAINT
1

Defendants' actions constitute a clear violation of wiretap laws, intrude upon users' right to privacy, and allow Defendants to unjustly profit from their unlawful activities.

6.     Plaintiff seeks to recover all available remedies, including statutory penalties, and to redress the wrongs imposed by Defendants on Plaintiff and Class members.

## II.   THE PARTIES

### A.   Plaintiff

7.     Plaintiff Maritza Albaran is a citizen and resident of Illinois. Plaintiff downloaded the TikTok app in 2019 and created a TikTok account on her mobile device. Plaintiff utilizes the TikTok app on a daily basis and uses the App for various functions besides simply a video-sharing and viewing platform. Specifically, Plaintiff Albaran frequently clicks on embedded links in TikTok videos to external, third-party websites. Without Plaintiff's prior knowledge and consent, Defendants surreptitiously collected data associated with Plaintiff's use of third-party websites.

### B.   Defendants

8.     TikTok Inc. f/k/a Musical.ly, Inc. ("TikTok Inc.") has at all relevant times been a California corporation doing business throughout the United States, with its principal place of business in Culver City, California. Defendant TikTok Inc. is a wholly owned subsidiary of TikTok, LLC.

9.     ByteDance Inc. is, and at all relevant times was, a Delaware corporation with its principal place of business in Mountain View, California. Upon information and belief, ByteDance Inc. operates in concert with TikTok Inc. to carry out instructions relating to the TikTok App. For example, according to LinkedIn profiles of ByteDance Inc. employees, these employees recruit applicants to work with them on research and development of software for the TikTok app. The ByteDance website also displays job postings that specifically relate to the TikTok app.

## III.   JURISDICTION AND VENUE

10.  This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this suit is brought under the laws of the United States—the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq*.

11.  This Court has subject matter jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are over 100 members of the proposed Classes, members of the proposed Classes are citizens of states in the United States, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

12.  This Court has general jurisdiction over Defendants TikTok Inc. and ByteDance Inc. because they have their principal place of business in California.

13.  This Court has specific jurisdiction over Defendants because they (i) transact business in California; (ii) they have substantial aggregate contacts in California; (iii) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of injuring persons in California, and (iv) purposely availed themselves of the laws in California.

14.  This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

15.  Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to these claims occurred in this District.

## IV.   FACTUAL ALLEGATIONS

### A. History of the TikTok App

16.  TikTok has quickly rose through the ranks of social media giants, gaining immense popularity in the U.S. and abroad over the last few years to notarize itself as one of the most populated social media applications available.

17.  TikTok's origins are different from the typical start-up. TikTok is not an empire built by a couple of friends or college students with a great idea, like Facebook; rather, TikTok started as three different applications. The first app was called

Musical.ly, which originally launched in Shanghau in 2014 but, from its inception, had strong U.S. business links and a sizable audience in the U.S. market.[1]

18. After Musical.ly gained traction in key markets, the Chinese tech giant ByteDance Inc. launched a similar service in China called Douyin. After Douyin's introduction to the market alongside Musical.ly, it attracted over 100 million users in China and Thailand in the span of a single year.

19. Realizing the popularity and opportunity in the video-sharing app market, ByteDance decided to expand itself under a different brand: TikTok. In 2018, ByteDance bought Musical.ly, folded it in to Douyin, and thus began TikTok's global expansion.

20. In July of 2019, TikTok surpassed Facebook, Instagram, Youtube and Snapchat in monthly installations, with more than one billion downloads worldwide, of which 500 million were active users. A year later they were on two billion downloads and about 800 million active users. From a relatively inconspicuous app used for lip-synching during its days as Musical.ly, TikTok continues to grow exponentially in terms of popularity and user count. Now, some of the most viral videos and trends that you find on other platforms can be traced back to TikTok. The significant user growth speaks volumes about the platform's popularity and engaging nature.

---

[1] Joe Tidy and Sophia Smith Galer, *TikTok: The Story of a Social Media Giant*, BBC News (Aug. 5, 2020), https://www.bbc.com/news/technology-53640724 (last visited January 23, 2023).

21.  TikTok is a video-sharing app that allows users to create and share short-form videos on virtually any topic. The platform allows users to get creative with their content using filters, stickers, voiceovers, sound effects, and background music:



22.  Through TikTok, users enjoy viewing and creating dancing, lip-synching videos, comedy skits, and "challenges," among other material. The variety of information and types of content that can be created are limitless—if you can imagine it, it likely exists on TikTok. This unique feature of the App sets it apart from the more established social media apps like Facebook and Instagram and allows the platform to provide an ever-changing product that keeps users coming back for more.

23.  The TikTok app has evolved in terms of features and capabilities. For instance, TikTok videos could originally be only up to 15 seconds. The platform has since extended this limit to allow up to 10 minutes of video from the original extension of up to 3 minutes. Such evolutions allow TikTok to compete with long-form video platforms such as YouTube and Facebook.

24.  The TikTok App has simplified the video creation and sharing process and taken it to the next level. Users can record anything and post it instantly. Due to the short format, neither the video-creation nor the watching process takes much time or effort. Additionally, this short-form video content is played as soon as a user opens the app. The videos continue to play on a rolling basis, allowing users to get lost in a sea of

fun, entertaining, and addictive video content. Accordingly, much like a slot machine at a casino, it is very easy (and, essentially, automatic) for people to keep watching random video and content for hours without realizing it.

25.   With the COVID-19 pandemic keeping many people at home, the popularity of entertainment sources such as TikTok soared. Between March and January of 2019, the number of unique TikTok visitors rose by 30.1%, reaching 28.8 million.[2] Throughout March 2019, the average time a U.S. visitor spent using the app was 14 hours and 18 minutes.

26.   In 2021, TikTok generated an estimated $4.6 billion in revenue with 1.2 billion people actively using the app in the last quarter of 2021. Of that statistic, the U.S. is TikTok's largest market outside of China.

### B. TikTok's Business Model Monetizes User Data for Profit

27.   Despite being a free social media app, TikTok amasses billions in revenue by relying on digital advertising space that is sold inside the application as its primary income source. As per reports, TikTok generated an estimated $1.9 billion in revenue in 2020, a 457% increase from $350 million in 2019. This massive jump in revenue stream was possible because of its two primary sources of revenue: advertisements and in-app purchases.[3]

28.   In June 2020, TikTok launched "TikTok for Business," a new advertising option that allowed brands to promote their products on the platform through in-feed videos, brand takeovers, top-view ads, hashtag challenges, and branded effects. Tracking information about a user's interests and habits are critical components of its advertising business model because it is precisely this kind of information that allows

---

[2] *Quick Guide to TikTok & Its Growth During COVID-19*, Adlucent, https://www.adlucent.com/resources/blog/quick-guide-to-tiktok-its-growth-during-covid-19/ (last visited January 20, 2023).

[3] Prachi Mishra, *TikTok Business Model – How Does TikTok Make Money?* (Aug. 8, 2022), https://www.feedough.com/tiktok-business-model-how-does-tiktok-make-money/ (last visited January 20, 2023).

TikTok to sell advertising to its customers as effective and targeted to specific audiences.

29.   In-feed videos ads are integrated into the short-form videos that get displayed between a user's feeds as they browse through the App's "For You" page. The unique proposition is that these ads appear between videos and might take up an entire screen,



similar to Instagram stories:[4]

30.   Brand Takeover Ads are different than In-Feed Ads, in that they appear immediately when a user opens the App to begin consuming content. Because the ad appears before a user is able to access and view any content on the App, these style ads occupy valuable space on the App and have the potential to bring in a lot of money for TikTok. In fact, the display of such ads can cost anything from $50,000 to $100,000.

---

[4] The "Adobe Lightroom" advertisement seen at the bottom of the graphic constitutes an In-Feed Ad. *See Id*.

CLASS ACTION COMPLAINT

7

31.   Top-View ads are 60-seconds long and, unlike brand takeover ads, appear after the user has already started using the TikTok App.  These ads are unique because they are full-screen and auto-play with sound. Advertisers can even include a call-to-action button within the ad that prompts viewers to take action and seemingly "exit" the app to interact with the business.  About 71% of TikTokers say Top View ads grab their attention, and the platform themselves not that partnering companies experience higher



sales effectiveness when they purchase these types of ads:[5]

---

[5] Kristen Wiley, *6 Types of TikTok Ads With Examples (Why and How They're Effective)*, Statusphere (Mar. 2, 2022), https://brands.joinstatus.com/6-types-of-tiktok-ads (last visited January 20, 2023).

32.   Branded Hashtag Challenges is one of TikTok's most lucrative revenue streams. In these ads, brands create their own hashtag challenge and pay TikTok to have their tag appear on people's discovery pages. A user who clicks the hashtag will be directed to the challenge's main page, where they can see detailed instructions as to the specific challenge. TikTok charges a heft amount for such an ad, which is $150,000 for the first six days of a hashtag challenge, plus an extra fee of about $100,000 to $200,000



to promote the challenge:[6]

33.   TikTok also provides Branded Effects, which allows companies to create branded custom stickers, augmented-reality filters, and lenses for consumers to use in their videos. TikTok generates revenue when brands buy these ads to reach their worldwide audiences.

34.   TikTok is a fast-growing social media platform, and while many people mistakenly think that it is used solely by teens, the age distribution for platform users

---

[6] *See id.*

ranges between 10 years old to 50+ years old. By covering a large swath of the population, TikTok is a major outlet for advertising by reaching a younger audience and still marketing the product to millions of adults. TikTok is essentially an irreplaceable resource to raise brand awareness.

35.   Many companies have already caught on to the importance of the platform and use it to promote their brands, such as Chipotle, the NBA, the NFL, Elf Cosmetics, and Guess.

### C. Global Privacy Concerns Regarding TikTok's Data Use Practices

36.   Despite its popularity amongst social media users and businesses, after TikTok's release in 2018, many privacy concerns regarding the app emerged and several countries have launched investigations amid concerns regarding TikTok's handling of user's personal data. In fact, TikTok has already litigated and settled over several different aspects of its data privacy.

### 1.   Concerns in the U.S.

37.   In October 2019, U.S. Senators Charles Schumer and Tom Cotton coordinated with the Acting Director of National Intelligence due to national security concerns over the possibility that TikTok may share personally identifiable ser information and private content with the Chinese government. Specifically, the Senators stated, "[w]ith over 110 million downloads in the U.S. alone, TikTok is a potential counterintelligence threat we cannot ignore. Given these concerns, we ask that the Intelligence Community conduct an assessment of the national security risks posed by TikTok . . . and brief Congress on these findings."[7]

38.   In February 2019, the U.S. Federal Trade Commission ("FTC" launched an investigation into TikTok's data privacy practices and entered into a consent decree with

---

[7] Press Release, Senators Chuck Shumer and Tom Cotton, (Oct. 24, 2019), https://www.cotton.senate.gov/news/press-releases/cotton-schumer-request-assessment-of-national-security-risks-posed-by-china-owned-video-sharing-platform-tiktok-a-potential-counterintelligence-threat-with-over-110-million-downloads-in-us-alone.

TikTok Inc. and TikTok Ltd., fining them $5.7 for collecting the information of minors under the age of 13 in violation of the Children's Online Privacy Protection Act ("COPPA"). Previously, TikTok claimed that underage age users were not allowed access to the app.

39. In July of 2020, the FTC and U.S. Department of Justice ("DOJ") again initiated investigations after a complaint was filed alleging that TikTok violated the terms of the prior consent decree. TikTok's violation of its prior consent decree with the FTC garnered compounding Congressional attention regarding the company's data practices.

40. As Congressional interest in TikTok's data privacy practices mounted, the close business relationship that TikTok's parent company, ByteDance, had with the Chinese government raised additional concerns that the data accumulated on U.S. users was at risk of being transferred to the Chinese government. Even without a close business relationship, ByteDance is subject to the laws of China that would require it to transfer data at the behest of the Chinese government.

41. In 2020, then-U.S. President Donald Trump labeled TikTok as a serious national security threat and proposed a ban on the app, ultimately issuing an executive order to that effect. At the heart of that ban was then-President Trump's concern that TikTok's "data collection threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information—potentially allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage."[8]

42. Major reporters, including CNBC and various cybersecurity experts, expressed concern over ByteDance's confirmed access to U.S. user data, especially after former TikTok employees expressed concern over the parent company's level of involvement in TikTok's operations.

_____

[8] Exec. Order No. 13942, 85 Fed. Reg. 48637 (Aug. 6, 2020).

CLASS ACTION COMPLAINT

43.   In June 2022, a BuzzFeed News report confirmed that despite years of TikTok's assertions to the contrary, ByteDance does hold, and has accessed, nonpublic data regarding U.S. TikTok users. A 2022 Internet 2.0 analysis on TikTok security found that the iOS application of TikTok connects directly to mainland China. The BuzzFeed report prompted several U.S. Senators to send a letter to TikTok Chief Executive Officer Shou Zi Chew expressing concern that "TikTok's representative did not provide truthful or forthright answers to the Senate Commerce Committee . . . [and] is now taking steps to deflect from its knowing misrepresentations by changing how 'protected' data can be accessed by its employees."[9]

44.   When confronted with these concerns, Tik Tok only doubled down. In September 2022, in testimony before the Senate Homeland Security Committee, TikTok Chief Operating Officer Vanessa Pappas confirmed that TikTok would not commit to cutting off China's access to U.S. user data. Instead, China's direct control over the app has only expanded as the Chinese government has recently acquired a 1% stake in the Beijing parent of ByteDance and a seat on its board.

45.   Aside from Congressional concern, the App's data privacy policies have also garnered the attention of several U.S. states' attorneys general. For example, Texas and Montana launched investigations in 2022, and California Attorney General Robert Bonta announced a bipartisan investigation in concert with Florida, Kentucky, Nebraska, Tennessee, Massachusetts, New Jersey, Vermont and yet-to-be disclosed attorney general offices from other states.

46.   TikTok's data practices have caused the U.S. Army, Navy, Air Force, Coast Guard, Marine Corps., Department of Defense, Department of Homeland Security, and TSA, and cannot be installed on government-issued phones. President Biden's campaign also urged its staff to remove the app from their work and personal devices.

---

[9] Letter from Senator Marsha Blackburn to Mr. Shou Zi Chew (June 28, 2022), https://www.blackburn.senate.gov/2022/6/blackburn-leads-letter-demanding-answers-on-tiktok-s-backdoor-data-access-for-beijing (last visited January 20, 2023).

Even Wells Fargo has forbidden its employees from installing the app on company mobile devices.

47.   The Federal Communications Commission ("FCC") Commissioner Brendan Carr has been increasingly vocal in his call for a ban of TikTok since writing to the CEOs of Apple and Google to remove the app from their app stores in June 2022, citing privacy concerns. Specifically, FCC Commissioner Brendan Carr stated, "I have a very, very difficult time looking at TikTok's conduct thinking we're going to cut a technical construct that they're not going to find a way around."

48.   Telling of TikTok's data practices is the widespread bipartisan concern over the company's unscrupulous collection, use, and transfer of user data. Senator Mark Warner, Chairman of the Senate Intelligence Committee, issued a warning during a Fox News Sunday appearance on November 20, 2022, that "TikTok is an enormous threat," and he questioned "the idea that we can somehow separate out TikTok from the fact that the actual engineers [are] writing the code in Beijing." He also stated that TikTok is "a massive collector of information . . . [and] can visualize even down to your keystrokes . . . all of that data . . . is being stored somewhere in Beijing." Chairman Mark Warner ended his criticism of TikTok by reminding viewers that "TikTok, at the end of the day, has to be reliant on the Communist Party, the China law states that."[10]

49.   Senator Warner and Senator Marco Rubio sent a bipartisan letter to the FTC in early 2022 requesting that the commission investigate TikTok once again. The letter calls out TikTok's "repeated misrepresentations . . . concerning its data security, data processing, and corporate governance practices," including those made under oath during a Congressional committee hearing in October 2021.[11]

---

[10] *Fox News Sunday* (Nov. 22, 2022), http://www.foxnews.com/video/6315965293112.
[11] Letter from Senators Marco Rubio and Mark Warner to FTC (July 6, 2022), https://www.rubio.senate.gov/public/index.cfm/2022/7/english-espa-ol-rubio-warner-call-for-investigation-into-tiktok-after-chinese-communist-party-s-access-to-u-s-data-comes-to-light (last visited January 20, 2023).

CLASS ACTION COMPLAINT

13

## 2. Concerns Abroad

50. In June 2020, the European Data Protection Board announced it was assembling a task force to examine TikTok's privacy and security practices.

51. In 2021, the Dutch Authority levied a €750,000 fine against TikTok following its investigation into TikTok's privacy practices relating to children. After the Dutch investigation, TikTok changed its settings to ensure better parental control over children's use of the app.

52. In the wake of TikTok's move to relocate its regional European headquarters to Ireland, in September 2021, the Ireland Data Protection Commission began an investigation into TikTok's protection of the personal data of legal minors, the extent of the app's age-verification measures for children under the age of thirteen, and the app's transfer of personal data to countries outside the European Union—including to China.

53. In July 2022, Italian data protection experts expressed concern that under a TikTok privacy policy updated affecting the European Economic Area, the U.K., and Switzerland, the app would cease asking users for permission before being tracked for targeted ads.

54. Recently, the U.K. Information Commissioner's Office issued a notice that TikTok "processed special category data without legal grounds to do so," "processed children's data without parental consent," and failed to provide information regarding its app to users in a "transparent and easily understood way." Specific examples of "special category data" are "ethnic and racial origin, political opinions, religious beliefs, sexual orientation, trade union membership, genetic and biometric data or health data."

55. In fact, India banned TikTok entirely, citing a law that allows the government to block websites and apps in the interest of the country's "sovereignty and integrity."

## 3. Biometric Data Privacy Litigation

56. In December 2020, Defendants were sued for their alleged violation of the Illinois Biometric Information Privacy Act ("BIPA"), a state statute that prohibits a private company from collecting, capturing, purchasing, receiving through trade, or

otherwise obtaining a person's or a customer's biometric identifiers or information without first obtaining the necessary approvals from the biometrics' owner.

57.   Pursuant to the litigation, TikTok users across the country who created videos in the app before September 30, 2021, began receiving payments between $27.84 and $167.04 following a $92 million class-action data privacy settlement in which the social media platform was sued for violating BIPA and a variety of common law claims.

58.   Notably, TikTok's BIPA litigation did not concern information collected through TikTok's in-app browser.

## D. TikTok's Use of In-App Browsers to Intercept Users' Sensitive and Personal Information Input into Third-Party Websites

59.   As alleged above, a large source of revenue for TikTok is selling advertising space on its platform. TikTok itself advertises that 1 in 2 Gen Z TikTok users are likely to buy something while using TikTok, that 81% of users use TikTok to discover new products and brands, and that TikTok video ads take up 6 times more screen space than banners.

60.   Typically, an internet user accesses a website using their default internet browser, such as Safari or Google Chrome.

61.   Pursuant to TikTok's business model, TikTok presents users with several additional ways to access links to third-party websites, one of which is TikTok video ads.

62.   Video ads typically load onto a user's feed and appear as a normal TikTok video except that they contain icons identifying them as sponsored posts or ads. These ad links provide direct access to third-party websites. As a video progressively plays, another box appears suggesting that the user click the link to view the product, which opens the third-party website. Finally, once the video concludes, the user is given a final opportunity to clink the link that opens to the third-party website.

63.   When a TikTok user attempts to access a third-party website using an in-app embedded link, the website does not open via the default browser. In other words, the

action of clicking a TikTok video link does not take the user out of the TikTok app, into the user's default web browser, and finally to the third-party website. Rather, unbeknownst to the user, the link is opened within Defendants' in-app browser. Thus, the user views the third-party website without leaving the TikTok app. As described below, this in-app browser usage makes TikTok privy to any information that the user inputs on this third-party website—whether it is sensitive or confidential—without the user knowing.

64. Aside from video ads, another avenue to TikTok's in-app browser is through TikTok profile links, which are available for users with large followings on the App. A TikTok user with more than 1,000 followers can add a link to external websites in their profile to market their products or bring users to websites outside the App:[12]



65. When users clink on a link in a profile, they are direct to an external website. Defendants fail to disclose that users actually are accessing the external website on

---

[12] Amanda Demeku, *How to Add a Link to Your TikTok Bio (and Drive More Clicks)*, LaterBlog, (June 22, 2021), https://later.com/blog/tiktok-link-in-bio/ (last visited January 20, 2023).

TikTok's in-app browser. In fact, when these links are clicked, there is no option to open the website via any browser other than TikTok's in-app browser.

66.   TikTok's in-app browser is troublesome for two important reasons. First, the in-app browser embeds a JavaScript code into the third-party websites that are accessed using the in-app browser. The third-party websites are not aware of and do not consent to the automatic insertion of codes to their websites. All the while, the JavaScript code surreptitiously intercepts all of the TikTok user's movements within and use of the in-app browser while it is open, allowing TikTok to track and capture all the details of the user's activities.

67.   While a user interacts with a third-party website via the TikTok app, TikTok records all keyboard inputs (essentially acting as a keylogger) and records every tap on any button, link, image, or other website element. Such detailed and unrelenting recording allows for the complete replication of the user's interaction with third-party website.

68.   Second, as described above, consumers spent over $500 million via the TikTok app in just the second quarter of 2021, including on TikTok's in-app browser.

69.   Quite frankly, TikTok users and the public at large would still be ignorant to TikTok's invasive in-app browser practices if not for the reporting of security and privacy researcher, Felix Krause. Felix Krause created and used a tool called InAppBrowser.com, which is designed to detect JavaScript commands executed by apps.[13] Krause concluded that "TikTok injects code into third party websites through their in-app browsers that behaves like a keylogger." Anything that a user does via TikTok's in-app browser is recorded and copied by Defendants, including what links were clicked, what form fields were filled out, how long a user hovered over a particular

---

[13] Felix Krause, *iOS Privacy: Announcing InAppBrowser.com – See what JavaScript Commands Get Executed In An In App Browser*, KRAUSEFC (Aug. 18, 2022), https://krausefx.com/blog/announcing-inappbrowsercom-see-what-javascript-commands-get-executed-in-an-in-app-browser (last visited January 20, 2023).

set of text, what images were viewed, and any written text (i.e., any personalized search queries). This gives rise to serious data protection concerns.

70. Alerting the public to TikTok's subversive data practices, Krause published his findings online including, *inter alia*, the specific code he uncovered and a description



of its functions:[14]

71. The exemplar above shows the specific JavaScript code used by Defendants' in-app browser in Apple iOS applications and Krause's analysis of that code, as well as his tool's description of the function of that code. On information and belief, Defendants' in-app browser inserts similar JavaScript coding into Android phone applications.

---

[14] *See id.*

72.   When a user accesses an external website through TikTok's in-app browser, TikTok tracks every minute detail of the user's interaction with the website. For example, for online purchases, TikTok's in-app browsers would collect and record all details of the purchase, including the item purchased; the name of the purchaser; their address, telephone number, credit card or bank information; usernames; passwords; dates of birth; and the purchase price.

73.   However, in-app purchases are only one function of TikTok's in-app browser. Thus, the in-app browser does not just track purchase information, it tracks vastly more information. Defendants likely obtain detailed private and sensitive information about users' physical and mental health as well.

74.   For example, several health providers and pharmacies have a digital presence on TikTok and utilize the advertising space offered by the social media giant. Planned Parenthood, a hotly debated organization in today's climate, offers a link to its website on TikTok's app.

75.   A user interacting with Planned Parenthood on TikTok can click the embedded link to Planned Parenthood's website and will be directed to its various resources with options to click and visit several topics within the website, including abortion; birth control; cancer; emergency contraception; pregnancy; sex; pleasure; sexual dysfunction; sexual orientation; and gender identity. Access to such information is highly personal and reveals sensitive information that most users intend to keep private and confidential. TikTok takes advantage of the user's trust and ignorance to the company's inherent powers and abilities and deploys its data tracking in-app browser to monetize the user's information by allowing third parties to send targeted content and advertisements to the user.

76.   TikTok does not limit itself when it comes to the type of information that is or is not intercepted: everything is up for grabs. If a user clicks the "Get Care" link on the Planned Parenthood "Abortion Clinics Near You" finder feature, a user is required to input sensitive and private information such as age, location, and the first day of the

user's last period. Providing false assurances that this sensitive information will remain confidential, TikTok provides to a user that "your information is private and anonymous," despite the fact that TikTok is actively intercepting it.

77.   Users also have the option to donate to Planned Parenthood on its website. To do so, a user inputs either PayPal credentials, bank account and routing numbers, or credit card number and expiration date, as well as a user's name, address, email, and phone number. Using its keystroke capturing JavaScript code, TikTok intercepts and records these inputs in real-time.

78.   Similar to Planned Parenthood, mental health service providers such as BetterHelp maintain a presence on TikTok and provide a link to its website on its profile page. A user who wishes to connect with a therapist is required to input sensitive and private information—such as religious affiliations, relationship status, financial status, etc.

79.   The above examples are just some of the thousands of third-party websites where users input private, personally identifying, and sensitive data. But all of the examples described in the foregoing paragraphs constitute instances where users could, and did, transact business via a third-party website without knowing they were using TikTok's in-app browser. Accordingly, Plaintiff and Class Members, as users of TikTok, did not consent to TikTok's intercepting, recording, and using of their digital information.

**E. The In-App Browser Data Collected by TikTok Is Inherently Valuable to Plaintiff, Class Members, and Third Parties**

80.   It is not by accident that Defendants centered their business model on the collection of personal data. To the contrary, it is common knowledge in the industry that there is a sizable economic market for consumers' personal data—including the information Defendants collected from Plaintiff and Class Members.

81. The Organization for Economic Cooperation and Development ("OECD") published a 2013 paper titled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value." In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses." OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USC 0.50 cents for an address, USC 2[i.e., $2.00] for a date of birth, USD 8 for a social security number [or other government ID number], USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military record is estimated to cost USD 55."[15]

82. For example, Meta (previously known as "Facebook") has offered to pay individuals for their voice recordings and has paid individuals up to $20 a month plus referral fees to install an app that allows Meta to collect data on how individuals use their smartphones. Although businesses like TikTok and Meta utilize the inherent monetary value of personal information, individuals can sell or monetize their own data if they so choose.

83. Given the monetary value of personal information, Defendants have deprived Plaintiff and Class members of the economic value of their data without providing proper or fair consideration for their property.

**F. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in the Data Collected by Defendants' In-App Browser**

84. Plaintiffs and Class members have a reasonable expectation of privacy in the data Defendants collected and monetized through the in-app browser.

---

[15] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value,* OECD iLibrary (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en;jsessionid=HRy2s76Juukwz34LjUyWnr_tnCmMPXNFgR6C4DU0.ip-10-240-5-158 (last visited January 20, 2023).

85.   Privacy polls and several studies uniformly conclude that nearly all Americans believe that a cornerstone of privacy rights is the need for an individual's affirmative consent before data is collected and shared. For example, a study by Consumer Reports confirmed that Americans have a diminished confidence that their "online information is private and secure."[16] Consistent with these findings, 92% of Americans confirmed their belief that internet companies and websites should be required to obtain consent before selling or sharing their data with other companies and should be required to provide consumers with a complete list of the data collected about them.

86.   Several states, such as California, have codified these data privacy requirements and safeguards.

87.   Despite Plaintiff's and Class members' reasonable expectation of privacy in their online activity and data, Defendants surreptitiously collected and used Plaintiff's and Class member's data in violation of their right to privacy.

**G. Plaintiff and Class Members Did Not Consent to Defendants' Collection of Data Through TikTok's In-App Browser**

88.   Plaintiff and Class members did not knowingly consent to Defendants' collection of their data through the in-app browser.

89.   Defendant acted unilaterally to collect Plaintiff's and Class member's online data and concealed the very nature of this collection by touting the privacy and anonymity of the TikTok platform. Nowhere in Defendants' Terms of Service, or the privacy policies, did Defendants disclose that TikTok compels users to use an in—app browser that embeds JavaScript code into advertised third-party websites that users visit from the TikTok app. Defendants also did not disclose that TikTok caches a complete record of a user's every keystroke, tap on any button, link, image, or any other

---

[16] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

component of any website, and collects intimate details about the user's clicks and browsing.

90.   Without disclosing the collection of this kind of data through TikTok's in-app browser—and, in fact, concealing such collection practices—Defendants cannot have secured consent for the sharing and/or use of this kind of sensitive data.

## V.   **TOLLING**

91.   Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

92.   The statute of limitations applicable to Plaintiff's claims were tolled by Defendants' conduct and Plaintiff's and Class Members' delayed discovery of their claims.

93.   As alleged above, Plaintiff did not know, and could not have reasonably discovered, when she downloaded and used TikTok that the app directed users to third-party websites through the in-app browser, which intercepted and recorded all of Plaintiff's activities and communications on third-party websites viewed in the in-app browser using JavaScript insertions that track every interaction with any third-party website.

94.   Plaintiff did not have the means to discover Defendant's allegedly unlawful conduct until the information was made public by Mr. Krause's research.

95.   Plaintiff could not have discovered, through the exercise of reasonable diligence, the full scope of Defendants' alleged unlawful conduct. Defendants seamlessly integrated their proprietary, in-app browser and the JavaScript insertions that tracked Plaintiff's activities, into the TikTok app. All while failing to disclose that the in-app browser modifies the source code of websites that users visit using the in-app browser, allowing TikTok to capture the content of every interaction the user has with a third-party website.

96.   All applicable statute of limitations have been tolled under the delayed discovery rule. Under the circumstances, Defendants were under a duty to disclose the

nature and significance of their data collection practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations.

## VI.   CLASS ALLEGATIONS

97.   Plaintiff brings this action under Rule 23, individually and on behalf of the following classes (collectively, the "Classes"):

> All natural persons in the United States who used the TikTok app to visit websites external to the app via TikTok's in-app browser.

98.   Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

99.   Numerosity: The exact number of class members is unknown, unavailable to Plaintiff, and in the sole custody of Defendants, but individual joinder is impracticable. As of January 2023, TikTok has over 138 million active users in the U.S.

100. Predominance: The Classes' claims present common questions of law and fact, which predominate over any questions that may affect individual Class Members. Common questions for the Classes include, but are not limited to, the following:

    a. Whether Defendants violated the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.*;

    b. Whether Defendants violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;

    c. Whether Defendants Violated the California Comprehensive Computer Data Access and Fraud Act Cal. Penal Code § 502, *et seq.*;

    d. Whether Plaintiff and the Class members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

e.  Whether Plaintiff and Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

101. Typicality: Plaintiff's claims are typical of the claims of other members of the Class. The claims of Plaintiff and Class Members arise from the same conduct by Defendants and are based on the same legal theories.

102. Adequate Representation: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendants have no defense unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor their counsel have any interest adverse to the interests of the other members of the Class.

103. Superiority: This class action is appropriate for class certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort and expense compared to individual litigations, as well as promote uniform decision-making.

104. Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## VII.   CLAIMS FOR RELIEF

### COUNT ONE
### Violation of the Federal Wire Tap Act
### 18 U.S.C. §§ 2510, et seq.

105. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

106. The Federal Wiretap Act, 18 U.S.C. §§ 2510, et seq., prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authority party to the communication. The statute confers a civil cause of action on "any person whose wire, oral, or electronic communications is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

107. "Intercept" is defined as the aural or other acquisition of the contents of any wire, electronic, or oral communications through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

108. "Contents" is defined as "include[ing] any information concerning the substance, purport, or meaning" of that communication. 18 U.S.C. § 2510(8).

109. "Person" is defined as "any employee or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

110. "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence, of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

111. Defendants are each a "person" for purposes of the Wiretap Act because they are corporations.

112. The JavaScript embedded by TikTok that copies every keystroke, every tap on any button, link, image, or other component and the details about the elements users clicked on constitute a "device or apparatus" that is used to intercept a wire, oral, or electronic communication because they are electronic means of acquiring the contents of users' wire, electronic, or oral communications via Defendants' in-app browser.

113. Plaintiff's and Class member's sensitive personal information and data that were intercepted by Defendants through their in-app browser are "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

114. Plaintiff and Class members reasonably believed that Defendants were not intercepting, recording, or disclosing their electronic communications.

115. Plaintiff's and Class members' electronic communications were intercepted during transmission, without their consent and for the unlawful and/or wrongful purpose of monetizing private information and data, including by using their private information and data to develop marketing and advertising strategies.

116. Interception of Plaintiff's and Class Members' electronic communications without their consent occurred whenever a user clicked on a link to a website external to TikTok. Defendants were not parties to those communications which occurred between Plaintiff and Class members and the websites they attempted to access or accessed. Defendants used Plaintiff's and Class members' electronic communications as part of their advertising and marketing business model.

117. Defendants' actions were at all relevant times knowing, willful, and intentional, particularly because Defendants are sophisticated parties who know the type of data they intercept through their own products. Moreover, experts who uncovered the JavaScript injections included in Defendants' in-app browser explained that the inclusion of the JavaScript injections were intentional, non-trivial engineering tasks— the kind that do not happen by mistake or randomly.[17]

118. Neither Plaintiff nor Class members consented to Defendants' interception, disclosure, and/or use of their electronic communications. The websites that Plaintiff and Class members visited did not know of or consent to Defendants' interception of

---

[17] Richard Nieva, *TikTok's In-App Browser Includes Code that Can Monitor Your Keystrokes, Researcher Says*, FORBES (Aug. 18, 2022), https://www.forbes.com/sites/richardnieva/2022/08/18/tiktok-in-app-browser-research/?sh=5b801c317c55.

the details about visitor's access to and activities on their websites. Nor could they—Defendants never sought to, or did, obtain Plaintiff's, Class members', or the websites' consent to intercept their electronic communications through Defendants' in-app browser.

119. Pursuant to 18 U.S.C. § 2520, Plaintiff and Class members have been damaged by the interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and the Class and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT TWO
### Violation of the California Invasion of Privacy Act
### Cal. Penal Code §§ 630, et seq. ("CIPA")

120. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

121. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

122. Cal. Penal Code § 632 prohibits eavesdropping upon or recording of any confidential communication, including those occurring among the parties in the presence of one another or by means of a telephone, telegraph, or other device, through

the use of an electronic amplifying or recording device without the consent of all parties to the communication.

123. By contemporaneously intercepting and accessing Plaintiff's and Class members' data regarding the websites they visited, their keystrokes, every tap on any button, link, image, or other component, and the details about the element users clicked on, Defendants—without consent and authorization of all parties—eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 631(a) of the CIPA.

124. Defendant utilized Plaintiff's and Class Members' personal data and information for their own purposes, including for advertising.

125. Neither Plaintiff nor the Class members consented to Defendants' interception, disclosure, and/or use of their electronic communications. The websites that Plaintiff and Class Members visited did not know of or consent to Defendants' interception of the details about visitor's access to and activities on their websites. Nor could they—Defendants never sought to, or did, obtain Plaintiff's, Class Members', or the websites' consent to intercept their electronic communications through Defendants' in-app browser.

126. Plaintiff and the Class members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

127. Plaintiff and Class members have also suffered irreparable injury from these unauthorized acts of disclosure; their personal, private, and sensitive data have been collected, viewed, accessed, stored, and used by Defendants, and have not been destroyed. Due to the continuing threat of such injury, Plaintiff and Class Members have no adequate remedy at law, Plaintiff and Class Members are entitled to injunctive relief.

## COUNT THREE

### Violation of the Comprehensive Computer Data Access and Fraud Act
### Cal. Penal Code § 502, et seq. ("CDAFA")

128. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

129. The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA") to "expand the degree of protection afforded . . . from tampering, interference, damage, and unauthorized access to [including the extraction of data from] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

130. Plaintiff's and Class members' devices on which they accessed the TikTok app and unknowingly accessed Defendants' in-app browser, including their computers, smart phones, and tablets, constitute "computers, computer systems, and/or computer networks" within the meaning of the CDAFA. Id. § 502(b)(5).

131. The information that Defendants obtains from the JavaScript injections through their in-app browser constitute data because the information is "a representation of information." *Id*. § 502(b)(7). "Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." *Id*.

132. Defendants violated § 502(c)(2) of the CDAFA by knowingly accessing and without permission taking, copying, or making use of any Plaintiff and Class members' data from a computer, computer system, or computer network. This includes, but is not limited to, data while it was in transit.

133. Defendant did so in order to wrongfully obtain and use their personal data in violation of Plaintiff and Class members' reasonable expectations of privacy in their devices and data.

134. Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within computer, computer system, or computer network without the intent or permission of the owner of the information." Defendants violated § 502(c)(8) by knowingly and without permission injecting JavaScript instructions into websites viewed using Defendants in-app browser which intercepted Plaintiff's and the Class members' data.

135. Plaintiff and Class members suffered damage and loss as a result of Defendants' conduct. Defendants' practices deprived Plaintiff and the Class members of control over their valuable property (namely, their data), the ability to receive compensation for that data, and the ability to withhold their data for sale.

136. Plaintiff and Class members seek compensatory damages in accordance with California Penal Code § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

137. Plaintiff and Class members have also suffered irreparable and incalculable harm and injuries from Defendant's violations. The harm will continue unless Defendants are enjoined from further violations of this section. Plaintiff and Class members have no adequate remedy at law.

138. Plaintiff and Class members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Defendants' violations were willful and, upon information and belief, Defendants are guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiff and the Class members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

## COUNT FOUR
**Violation of California Business & Professions Code §§ 17200, et seq.**

139. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

140. Defendants' business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., ("UCL"), because, as alleged, Defendants violated the California common law, California Constitution, and other statutes and causes of action described herein.

141. Defendants' business acts and practices are "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interest, including protecting consumers' personal data. Defendants violated this public policy by, among other things, surreptitiously collecting data about its users through its in-app browser without Plaintiff's or Class members' consent. Defendants' conduct violates the policies described herein.

142. Defendants' business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm posed and caused by Defendants' secretly collecting data about Plaintiff and the Class members is significant, and there is no corresponding benefit resulting from such conduct. Because Plaintiff and the Class members were completely unaware of Defendants' conduct, they could not have avoided the harm.

143. Defendants failed to disclose (i.e., omit) the existence of the in-app browser or the insertion of JavaScript code intentionally designed to intercept Plaintiff's and Class members' private information and data. Without disclosing the existence of the in-app browser and the JavaScript insertions that track every detail of a user's activity in the in-app browser the disclosures, Defendants' privacy policies are meaningless.

144. Defendants' business acts and practices were likely to, and did, deceive members of the public, including Plaintiff and the Class members, into believing that their use of the TikTok app, and their access of websites through the app, was private.

145. Defendants' violations were, and are, willful, deceptive, unfair, and unconscionable.

146. Had Plaintiff and the Class members known that information about their access to websites through the app would be collected and used by Defendants for their own benefit, they would not have used those services.

147. Plaintiff and Class members have a property interest in their data, including data about the websites they access, their keystrokes, their credit card information, etc.

148. Defendants have taken property from Plaintiff and the Class members without providing just, or any, compensation.

149. Plaintiff and Class members have lost money and property as a result of Defendants' conduct in violation of the UCL. Data, about Plaintiff and the Class members, has value. Companies are willing to pay for data, like the data unlawfully collected and used by Defendants.

150. By deceptively collecting and using data about Plaintiff and the Class members, Defendants have taken money and property from Plaintiff and Class members. Moreover, Defendants were able to use the data obtained from Plaintiff and Class members to support their business model of profiting from advertising.

151. For the foregoing reasons, Plaintiff seeks restitution, disgorgement, injunctive relief, and compensatory damages on behalf of herself and Class Members.

## **COUNT FIVE**
### **Violation of Common Law Invasion of Privacy—Intrusion Upon Seclusion**

152. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

153. Plaintiff asserts claims for intrusion upon seclusion and so must plead (1) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiff and Class members had a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

154. Defendants' in-app browser inserts JavaScript instructions into any website that is visited using the in-app browser. These JavaScript instructions record every

keystroke, which could include names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouse's names, children's names, or any other information which is typed into the in-app browser. The JavaScript instructions also record every tap on any button, link, image, or other component of a website. This provides Defendants with very detailed information about the kinds of things that each user of the in-app browser is tapping or "clicking" on. Finally, the JavaScript instructions in Defendants' in-app browser provide Defendants with details about the elements users clicked on – providing them with additional information about the content that is being viewed or clicked on during use of the in-app browser.

155. Defendants' copying of all these kinds of data using the undisclosed JavaScript tracking insertions constitutes an intentional intrusion upon Plaintiff and Class members' solitude or seclusion in that Defendants collected these kinds of sensitive pieces of information that were intended to stay private from third parties without users' consent.

156. Plaintiff and Class members had a reasonable expectation of privacy in their data. Plaintiff and Class members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiff and Class members never agreed that Defendants could collect or disclose their data from third-party websites.

157. Plaintiff and Class members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiff and Class members never agreed that their data would be collected or used by Defendants.

158. Defendants' intentional intrusion on Plaintiff's and Class Members' solitude or seclusion without consent would be highly offensive to a reasonable person. Plaintiff and Class Members reasonably expected that their data would not be collected or used.

159. The surreptitious taking and disclosure of data from millions of individual TikTok users was highly offensive because it violated expectations of privacy that have

been established by social norms. Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

160. Given the nature of the data Defendants collected and disclosed including, but not limited to: names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouses names, children's names, or any other information which is typed into the in-app browser, every tap on any button, link, image or other component of a website, and details about the contents of what users clicked and/or viewed—this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

161. As a result of Defendants' actions, Plaintiff and Class members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

162. Plaintiff and Class members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

163. Plaintiff and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class members for the harm to their privacy interests as well as a disgorgement of profits made by Defendants as a result of its intrusions upon Plaintiff's and Class members' privacy.

164. Plaintiff and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiff and Class members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

165. Plaintiff also seeks such other relief as the Court may deem just and proper.

## **COUNT SIX**

### **Invasion of Privacy and Violation of the California Constitution, Art. 1, § 1**

166. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

167. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."   California Constitution, Article I, Section 1.

168. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

169. The right to privacy in California's constitution creates a right of action against private and government entities.

170. Plaintiff and Class members have and continue to have a reasonable expectation of privacy in their personal information, identities, and data pursuant to Article I, Section I of the California Constitution.

171. Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, including that: (i) the data collected by Defendants; and (ii) Plaintiff and Class Members did not consent or otherwise authorize Defendants to collect and use this private information for their own monetary gain.

172. The confidential and sensitive data, which Defendants intruded upon, intercepted, collected, and disclosed without Plaintiff's and Class Members' authorization or consent, included, without limitation: names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouses names, children's names, or any other information which is typed into the in-app browser, every tap on any button,

link, image or other component of a website, and details about the contents of what users clicked and/or viewed.

173. Defendants' actions constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that: (i) the data collected was highly sensitive and personal, as protected by the California Constitution; (ii) Defendants did not have authorization or consent to collect this information; and (iii) the invasion deprived Plaintiff and Class members the ability to control the circulation of said information, which is considered a fundamental right to privacy.

174. Defendants' invasion violated the privacy rights of millions of Class members, including Plaintiff, without authorization or consent. Their conduct constitutes a severe and egregious breach of social norms.

175. As a result of Defendants' actions, Plaintiff and Class Members have sustained damages and will continue to suffer damages as a direct and proximate result of Defendants' invasion of privacy.

176. Plaintiff and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant because of its intrusions upon Plaintiff's and Class members' privacy.

177. Plaintiff and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiff and Class members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

178. Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT SEVEN**
**Unjust Enrichment**
**(On Behalf of Nationwide Class)**

179. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

180. Defendants received benefits from Plaintiff and Class members in the form of data which has substantial monetary value that Defendants sold for marketing and advertising purposes and unjustly retained those benefits at the expense of Plaintiff and Class members.

181. Plaintiff and Class members unknowingly conferred a benefit upon Defendants in the form of valuable sensitive information that Defendants collected from Plaintiff and Class members, without authorization and proper compensation. Defendants collected and used this information for its own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation from third parties who utilize Defendants' marketing and advertising services.

182. Defendants unjustly retained those benefits at the expense of Plaintiff and Class members because Defendants' conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class members.

183. The benefits that Defendants derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles in California and every other state for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

184. Defendant should be compelled to disgorge, in a common fund for the benefit of Plaintiff and Class members, all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

## VIII.    PRAYER FOR RELIEF

185. WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a. An order certifying the proposed Classes, designating Plaintiff as the named representative of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Code of Civil Procedure § 382;

b. An order enjoining Defendants to desist from further deceptive business practices with respect to the in-app browser and such other injunctive relief that the Court deems just and proper;

c. A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

d. An award for Plaintiff and Class members costs, restitution, compensatory damages for economic loss and out of pocket costs, damages under applicable state laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

e. All remedies available under the Wire Protection Act, including but not limited to damages whichever is greater of (A) actual damages suffered by Plaintiff and Class members and any profits made as a result of the violations; or (B) statutory damages of whichever is greater of $100 a day for each day of violation of $10,000;

f. All remedies available under CIPA, including but not limited to damages whichever is great of (1) five thousand dollars ($5,000) per violation; or (2) three times the amount of actual damages sustained by the Plaintiff and Class Members;

g. All remedies available under the CDAFA, including but not limited to compensatory damages, injunctive relief, and punitive and exemplary damages;

h. All remedies available under the UCL, including but not limited to, restitution, disgorgement, injunctive relief, and compensatory damages;

i.   Any applicable statutory and civil penalties;

j.   Any award of costs and attorneys' fees, as allowed by law;

k.   An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

l.   Leave to amend this Complaint to conform to the evidence produced at trial; and

m.   Such other or further relief as the Court may deem appropriate, just, and equitable under the circumstances.

## IX.    DEMAND FOR JURY TRIAL

186.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: January 23, 2023

Respectfully submitted,

*/s/ Tina Wolfson*
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Theodore Maya (SBN 223242)
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505-4521
Telephone: (310) 474-9111
Facsimile: (310) 474-8585